[Cite as *Rosenshine v. Med. College Hosps.*, 2012-Ohio-6361.]



# Court of Claims of Ohio

The Ohio Judicial Center
65 South Front Street, Third Floor
Columbus, OH 43215
614.387.9800 or 1.800.824.8263
www.cco.state.oh.us

DAWN ROSENSHINE, Exec.

    Plaintiff

    v.

MEDICAL COLLEGE HOSPITALS

    Defendant

Case No. 1998-04701

Magistrate Holly True Shaver

DECISION OF THE MAGISTRATE

{¶ 1} On June 26, 2012, the Tenth District Court of Appeals issued a decision that reversed this court's prior judgment in favor of defendant, rendered judgment in favor of plaintiff as to the issue of liability, and remanded the matter to this court for further proceedings on the issue of damages. On November 1, 2012, this court heard oral argument and accepted additional evidence with regard to the issue of damages.

{¶ 2} On May 30, 1995, Theresa Dougherty was admitted to defendant's hospital for a cardiac catheterization.[1] One of the procedures that Theresa underwent during that visit was a chest x-ray to exclude the possibility of myocardial infarction. The x-ray was taken and a report was prepared by a radiologist, who noted a "right upper lung mass, measuring 2.5 centimeters." On June 2, 1995, Theresa was discharged from defendant's hospital, but the discharge summary did not refer to the x-ray, and no one informed Theresa of the results. In November 1996, Theresa was diagnosed with

---

[1]Plaintiff's decedent, Theresa Dougherty, shall be referred to as Theresa throughout this decision. Plaintiff, Dawn Rosenshine, is Theresa's daughter and the executor of Theresa's estate.

cancer in both of her lungs, which had spread to her brain and was inoperable.  Theresa died on November 3, 1997.

{¶ 3} In its decision, the Tenth District Court of Appeals held that it was against the manifest weight of the evidence for this court to conclude that the failure to diagnose the mass in Theresa's right lung was not the proximate cause of her death.  In so holding, the Court of Appeals found most persuasive Dr. Robert J. Steele's opinion that Theresa's "prognosis in May 1995, had she been diagnosed and treated, was 70 percent survival * * *." *Rosenshine v. Medical College Hosps.*, 10th Dist. No. 11AP-374, 2012-Ohio-2864, ¶ 18.  Accordingly, the court makes the following determination.

{¶ 4} Plaintiff's claims sound in survivorship and wrongful death on behalf of the heirs and next of kin of Theresa.  Pursuant to R.C. 2125.02(A)(2), the court "may award the reasonable funeral and burial expenses incurred as a result of the wrongful death." Plaintiff's Exhibits 5 and 6 show that plaintiff incurred funeral and burial expenses for Theresa in the amounts of $6,254.38 and $4,464.19, respectively, for a total of $10,718.57, which shall be awarded.  The parties agree that aside from the funeral and burial expenses, there is no claim for economic damages in this matter.

{¶ 5} Theresa was born on March 3, 1939, and was 57 years old when she died. Theresa is survived by her three adult children, Dawn Rosenshine, Robert Dougherty, Jr., and Vincent Dougherty, and Vincent's daughter, Alyssa, who was Theresa's only grandchild at the time of her death.  Theresa's children provided individual written statements regarding how their mother's death has affected them, and Dawn's deposition was submitted as well.  (Plaintiff's Exhibits 2-4, 21.)

{¶ 6} Dawn testified that Theresa was diagnosed with lung cancer two weeks after Robert Dougherty, Sr. (Theresa's husband) died of colon cancer in November 1996.  Even though Theresa's cancer was inoperable when she was made aware of its diagnosis, Theresa chose to undergo radiation therapy with the hope that it would extend her life.  After she concluded radiation treatments in Ohio, Theresa went to live

in New York City with Dawn and Dawn's husband. Theresa died in Dawn's home, under hospice care. The evidence shows that Theresa was not informed of the presence of a tumor in her lung for approximately one year, and for approximately another year, Theresa lived with the knowledge that her medical treatment had been delayed, resulting in inoperable cancer that had spread to her brain. According to Dawn, Theresa initiated this lawsuit because she was very upset that she was not informed about the tumor when it was first detected on the x-ray, and she did not want the same result to happen to another patient. Theresa urged Dawn to pursue the claim as executor.

{¶ 7} Dawn testified that her mother was in considerable pain during the last few months of her life, and that she was prescribed morphine, along with other pain medication from the summer of 1997 until her death. Dawn sought counseling services from her rabbi and a priest, and she attended a support group to cope with the grief she sustained as a result of her mother's death.

{¶ 8} Robert Dougherty, Jr., was living in Connecticut when Theresa's cancer was diagnosed and he visited her frequently during the time that she lived in New York City. Vincent was living in Ohio when Theresa was diagnosed with cancer. Prior to her diagnosis, both Theresa and her husband had been primary care givers to Vincent's daughter Alyssa, who was born in December 1990. From birth, Alyssa lived in two places: with Theresa and her husband approximately four days per week, and with her other grandmother for the other three days. However, in October 1996, Alyssa went to live with her other grandmother because Theresa was caring for her dying husband. Thereafter, Alyssa continued to visit Theresa but did not return to live with her. At the time of Theresa's death, Dawn, Robert Jr., and Vincent were all adult children, and Alyssa was almost 7 years old.

{¶ 9} Defendant argues that Theresa suffered from multiple health problems aside from the undiagnosed tumor, which would have significantly shortened her life

expectancy.  Specifically, Theresa had a history of cardiac problems and was a life-long cigarette smoker.  Defendant also seeks a determination from this court that Theresa was comparatively negligent in that she began to smoke cigarettes when she was 13 years old and continued to smoke until her death, despite being aware of the risk of death from smoking.  The court finds that inasmuch as the Court of Appeals rendered judgment in favor of plaintiff without consideration of defendant's comparative negligence argument, this court is confined to the issue of damages.[2]  However, Theresa's state of health is a factor that this court shall consider in awarding damages. Pursuant to R.C. 2125.02(A)(3)(b)(i), the "court may consider all factors existing at the time of the decedent's death that are relevant to a determination of the damages suffered by reason of the wrongful death."  For example, "it is proper to take into consideration such factors, varying in individual cases, as the victim's life expectancy, character, health, habits, talents, prospects, * * * needs of and contributions to [her beneficiaries] and current returns on investments."  *Sutfin v. Burton*, 91 Ohio App. 177, 193, (8th Dist. No.1951) citing 16 American Jurisprudence, 127, 160, "Death," Sections 190 to 242.

{¶ 10} The parties have submitted the depositions of Joel Kahn, M.D., Elloise Gard, M.D., and Robert Steele M.D., to be considered regarding Theresa's estimated life expectancy. Elloise Gard, M.D., board-certified in internal medicine, first treated Theresa in December 1994.  With regard to Theresa's family medical history, Dr. Gard testified that Theresa's mother had breast cancer, Theresa's father suffered a heart attack at age 48, and two of Theresa's sisters died of cancer.  Theresa smoked one pack of cigarettes per day for approximately 40 years.  Dr. Gard advised Theresa to stop smoking because smoking is known both to worsen heart disease and to cause

---

[2]The court notes that defendant raised the issue of the comparative negligence of smoking in its March 29, 2010 trial brief.

cancer. Dr. Gard was also concerned about Theresa's cholesterol level because it was high for a person with known heart disease.

{¶ 11} Joel Kahn, M.D., a cardiologist, testified that at the age of 46, Theresa was diagnosed with severe heart disease that required a triple bypass surgery that was performed in 1985. Ten years later, Theresa was diagnosed with progressive angina. The catheterization that she was admitted to defendant's hospital for in May 1995 showed that she had lost one of her three bypass grafts. Based solely upon Theresa's cardiology issues, Dr. Kahn opined that her life expectancy would not exceed 10 years past the date of her May 30, 1995 hospitalization. Dr. Kahn noted that a normal life expectancy for a 56-year old woman would be an additional 20 to 25 years.

{¶ 12} Robert Steele M.D., board-certified in internal medicine and medical oncology, opined that in May 1995, the lesion in Theresa's right lung was a stage one cancer, but that the nodes were negative and that there was no metastatic disease at that time. Dr. Steele opined that when x-rays were taken of Theresa's lungs in 1996, she had cancerous tumors in both lungs and in her brain. Dr. Steele opined that the 2.5 centimeter mass in her right lung was most likely a different type of cancer from the lesion in her left lung, and that it was more likely than not that Theresa suffered from multiple, primary cancers rather than having suffered metastasis of the cancer in the right lung to the left lung.

{¶ 13} Dr. Steele testified that if the cancer in Theresa's right lung had been timely diagnosed, she would have undergone a wedge resection of her right lung, and she probably would not have undergone chemotherapy or radiation at that time. Dr. Steele further testified that in 1996, Theresa would have most likely undergone a second similar surgery to remove the cancer from her left lung.

{¶ 14} In the survival action, plaintiff seeks compensation for Theresa's conscious pain and suffering prior to her death. A survival action brought to recover for a decedent's own injuries before her death is independent from a wrongful death action

seeking damages for the injuries that the decedent's beneficiaries suffer as a result of the death, even though the same nominal party prosecutes both actions. *Peters v. Columbus Steel Castings Co.*, 115 Ohio St.3d 134, 2007-Ohio-4787, ¶ 7.

{¶ 15} Defendant argues that even if the tumor in Theresa's right lung had been disclosed to her timely, she would have undergone a wedge resection of her right lung, a painful procedure. However, Dr. Steele testified that if Theresa had undergone a wedge resection of her right lung in June 1995, she may not have had to undergo radiation therapy at that time. The court finds that Theresa endured pain and suffering as a result of radiation therapy in 1996, and that her pain and suffering should not be lessened despite the fact that she did not also undergo a wedge resection. The court finds that Theresa suffered conscious pain and suffering as a result of the delayed diagnosis of her cancer: specifically, Theresa sustained physical pain and suffering as a result of undergoing radiation therapy, and severe mental anguish as a result of knowing that her diagnosis of cancer in her right lung was delayed for approximately one year. Based upon the conscious pain and suffering and severe mental anguish that Theresa sustained prior to her death, $100,000 is recommended for the survivorship claim.

{¶ 16} Turning to the damages associated with the wrongful death claim, the applicable provisions of R.C. 2125.02(B) state that "[c]ompensatory damages may be awarded in a civil action for wrongful death and may include damages for the following:

{¶ 17} "* * *

{¶ 18} "(3) Loss of the society of the decedent, including loss of companionship, consortium, care, assistance, protection, advice, guidance, counsel, instruction, training, and education, suffered by the surviving spouse, dependent children, parents, or next of kin of the decedent;

{¶ 19} " * * *

{¶ 20} "(5) The mental anguish incurred by the surviving spouse, dependent children, parents, or next of kin of the decedent."

{¶ 21} Based upon the evidence submitted with regard to Theresa's family history of cancer and heart disease, and her own significant heart disease, the court finds persuasive Dr. Kahn's opinion that based solely upon Theresa's cardiac issues, her life expectancy would have been no more than ten years past May 1995. In addition, in light of Dr. Steele's testimony, the court finds that it is more likely than not that the secondary cancer that was present in Theresa's left lung in 1996 would have also adversely affected her life expectancy.

{¶ 22} Pursuant to R.C. 2125.02(A)(2), the court "may award damages authorized by division (B) of this section, as it determines are proportioned to the injury and loss resulting to the beneficiaries described in division (A)(1) of this section by reason of the wrongful death." R.C. 2125.01(A)(1) states that "a civil action for wrongful death shall be brought in the name of the personal representative of the decedent for the exclusive benefit of the surviving spouse, the children, and the parents of the decedent, all of whom are rebuttably presumed to have suffered damages by reason of the wrongful death, and for the exclusive benefit of the other next of kin of the decedent." Pursuant to R.C. 2125.02, other next of kin, such as grandchildren, although not presumed to have sustained damages, may recover damages for mental anguish and loss of society upon proper proof thereof, even though there is a surviving parent, spouse, or children. *Senig v. Nationwide Mutual Insurance Co.*, 76 Ohio App.3d 565, 574 (10th Dist.1992).

{¶ 23} Based upon the evidence presented, the court finds that Alyssa had a close relationship with her grandmother, Theresa, as Theresa was a primary care giver to her throughout most of her early childhood. Therefore, the court finds that plaintiff has proven by a preponderance of the evidence, that Alyssa should recover damages as a result of Theresa's wrongful death. Based upon the specific facts of this case, considering both Theresa's close relationship with her children and Theresa's level of

involvement in raising her granddaughter Alyssa, balanced against her shortened life expectancy independent of defendant's negligence, the court recommends awards of non-economic damages for loss of society and mental anguish as follows: to plaintiff Dawn Rosenshine, $30,000; to Robert Dougherty, Jr., $30,000; to Vincent Dougherty, $30,000; and to Alyssa Dougherty, $10,000.

{¶ 24} In summary, judgment is recommended in the amount of $210,743.57, which includes the $25 filing fee.

{¶ 25} R.C. 3345.40(B)(2) provides that any award against a state university or college shall be reduced by the amount of "benefits" a plaintiff receives or is entitled to receive "for injuries or loss allegedly incurred from a policy or policies of insurance or any other source * * *." It is undisputed that plaintiff received a settlement of $25,000 as a result of litigation in the connected action, and $20,000 from a life insurance policy. Defendant argues that any award of damages should be reduced by both of these amounts. (Exhibits D and C to Defendant's Trial Brief.) However, the Tenth District Court of Appeals has determined that the word "benefits," as it appears in R.C. 3345.40(B)(2), refers to "'financial assistance received in time of sickness, disability, unemployment, etc., either from insurance or public programs, such as social security.'" *See Aubry v. Univ. of Toledo Med. Ctr.*, 10th Dist. No. 11AP-509, 2012-Ohio-1313, ¶ 22, quoting *Black's Law Dictionary* 158 (6th Ed. 1990). In the instant case, inasmuch as plaintiff's settlement in the connected action does not constitute a benefit under the definition set forth in *Aubry*, the court concludes that the statute does not operate to reduce plaintiff's award by the amount of that settlement. Likewise, R.C. 3345.40(B)(2) further states: "Nothing in this division affects or shall be construed to limit the rights of a beneficiary under a life insurance policy or the rights of sureties under fidelity or surety bonds." Therefore, the court concludes that the plain language of R.C. 3345.40(B)(2) prohibits this court from reducing plaintiff's award by the amount of life insurance proceeds that plaintiff received. Thus, the court finds that neither the settlement

proceeds nor the life insurance proceeds constitute "benefits" to be deducted from plaintiff's award of damages.

{¶ 26} The Lucas County Probate Court apportioned the settlement proceeds from the connected action equally among Theresa's adult children. (Exhibit D to Defendant's Trial Brief.) However, inasmuch as the court has found that plaintiff has proven that Alyssa is entitled to a claim of damages, this matter must be returned to the probate court for an equitable distribution of damages to the beneficiaries according to their respective injury or loss. Accordingly, it is recommended that final judgment shall be entered in favor of plaintiff after the probate court has adjusted the share that each beneficiary is to receive.

{¶ 27} *A party may file written objections to the magistrate's decision within 14 days of the filing of the decision, whether or not the court has adopted the decision during that 14-day period as permitted by Civ.R. 53(D)(4)(e)(i). If any party timely files objections, any other party may also file objections not later than ten days after the first objections are filed. A party shall not assign as error on appeal the court's adoption of any factual finding or legal conclusion, whether or not specifically designated as a finding of fact or conclusion of law under Civ.R. 53(D)(3)(a)(ii), unless the party timely and specifically objects to that factual finding or legal conclusion within 14 days of the filing of the decision, as required by Civ.R. 53(D)(3)(b).*

_____
HOLLY TRUE SHAVER
Magistrate

cc:

Anne B. Strait                                    Mark F. Vitou
Assistant Attorney General                        111 West Dudley
150 East Gay Street, 18th Floor                   Maumee, Ohio 43537-2140
Columbus, Ohio 43215-3130

002
Filed December 21, 2012
To S.C. Reporter March 22, 2013